UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| TYLER GEORGE | § | |
| | § | |
| v. | § | CIVIL NO. 4:24-CV-1063-SDJ |
| | § | |
| AMAZON.COM SERVICES LLC | § | |

## MEMORANDUM OPINION AND ORDER

Tyler George, a former warehouse associate for Amazon.com Services, LLC (Amazon), filed suit against Amazon asserting negligence claims connected with an on-the-job injury. Invoking an arbitration agreement included in its employee-injury benefit plan, Amazon has moved to compel arbitration under the Federal Arbitration Act (FAA). (Dkt. #18). George opposes the motion, claiming that he is exempt from arbitration under Section 1 of the FAA.

Section 1 exempts from the Act's coverage "contracts of employment" of two enumerated categories of workers—"seamen" and "railroad employees." It also exempts employment contracts that fall within a residual category embracing "any other class of workers engaged in foreign or interstate commerce." George maintains that he falls within Section 1's residual category because he is part of a class of Amazon workers engaged in interstate commerce. Having reviewed the parties' submissions, the record, and the applicable law, the Court concludes that George is not part of a class of workers engaged in interstate commerce and therefore he is not exempt under Section 1. Amazon's motion to compel arbitration will be granted.

## I.

George was hired by Amazon around September 1, 2023, and his injury occurred about six weeks later, on October 11, 2023. During this time George worked as a warehouse associate at an Amazon facility in Lewisville, Texas, known as DDF1. Although the DDF1 facility is sometimes referenced in the parties' filings as an Amazon fulfillment center, the testimony of George and Amazon's corporate representative confirm that DDF1 is a delivery station. A delivery station is the last stop for an Amazon product or package before being delivered to the end customer. The record further confirms that DDF1 received shipments via trucks and trailers for final delivery to end customers within about thirty miles of the facility, that is, within the Dallas–Fort Worth area. Thus, there were no outgoing shipments from the DDF1 facility delivered outside Texas. And as for the inbound shipments received at DDF1 during the period George worked there, Amazon's records show that only 1.3% of such shipments, 14 out of 1073, arrived from outside Texas. Thus, nearly 99% of shipments arriving at the facility began at an origin point in Texas.

As a warehouse associate at the DDF1 facility, George was part of a group of workers who unloaded inbound shipments that nearly exclusively arrived at the facility from origin points in Texas and processed such packages for final delivery to end customers within about a thirty-mile radius of the facility. This included loading the packages on vehicles that would make the final delivery to end customers in the Dallas–Fort Worth area.

## II.

George alleges that on or about October 11, 2023, he was injured while working at the DDF1 facility. Thereafter, he filed suit against Amazon asserting negligence claims connected with his on-the-job injury. George seeks to recover damages for past and future medical expenses, lost wages, loss of earning capacity, physical pain and suffering, mental anguish, and physical impairment.

For its part, Amazon contends that George entered into an arbitration agreement that requires his injury claims be resolved before the American Arbitration Association (AAA). When George was hired, he received a copy of the "AmazonTXCare Employee Injury Benefit Plan: Texas Workers' Compensation Plan" Summary Plan Description (the "Plan") and George acknowledged receipt of the Plan by signing a document, "Receipt and Acknowledgement of Summary Plan Description and Mutual Agreement to Arbitrate." (Dkt. #18-2 at 33). Amazon maintains, and George does not dispute, that by signing George acknowledged that he received a copy of Amazon's Mutual Agreement to Arbitrate. Specifically, George agreed and acknowledged that "certain disputes between [him] and Amazon will be referred to mandatory binding arbitration rather than to a judge or jury." (Dkt. #18-2 at 33).

The arbitration agreement requires the parties to arbitrate a "Covered Claim," defined as:

> all claims that [Amazon] or [George] may have which arise from: any injury suffered by [George] while in the Course and Scope of [George's] employment with [Amazon], including but not limited to, claims for negligence, gross negligence, and all claims for personal injuries, physical impairment, disfigurement, pain and suffering, mental anguish, wrongful death, survival actions, loss of consortium and/or

3

> services, medical and hospital expenses, expenses of transportation for medical treatment, expenses of drugs and medical appliances, emotional distress, exemplary or punitive damages and any other loss, detriment or claim of whatever kind and character[.]

A Covered Claim is exclusively subject to binding arbitration. (Dkt. #18-2 at 29). While the employee retains all substantive legal rights and remedies under the arbitration agreement, he "waiv[es] all rights [he] may have with regard to trial, whether jury or non-jury, in state or federal court for any Covered Claim." (Dkt. #18-2 at 29). The parties also delegated by agreement all matters of arbitrability to the arbitrator. *See* (Dkt. #18-2 at 29) (stating that "the Arbitrator, and not any court, shall have exclusive authority to resolve any dispute relating to the validity, applicability, enforceability, unconscionability or waiver" of the arbitration agreement). Amazon argues that the agreement is controlling and George's claims must be resolved through arbitration.

In response, George contends that he is exempt from arbitration under Section 1 of the FAA because, as a warehouse associate at Amazon's DDF1 facility, he was "engaged in foreign or interstate commerce." (Dkt. #7 at 3) (citing 9 U.S.C. § 1). According to George, he was "an integral part of Amazon's interstate logistics chain." (Dkt. #23 at 3). George points to his daily work, such as unloading incoming trucks and trailers at the DDF1 facility, and describes such duties as involving "goods shipped from out-of-state [Amazon] fulfillment centers and loading outbound delivery vans that carried those same goods to Amazon's customers." (Dkt. #23 at 3). He further states that his work "directly involved the receipt, movement, and handling of goods that had not yet come to rest in Texas." (Dkt. #23 at 4). Based on this view

4

of his job, George invokes FAA Section 1 to argue he cannot be compelled to arbitrate his personal-injury claim against Amazon.

### III.

### A.

Enacted a century ago, the FAA was Congress's response to the general "hostility of American courts to the enforcement of arbitration agreements." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). The Act "directed courts to abandon their hostility and instead treat arbitration agreements as 'valid, irrevocable, and enforceable.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505, 138 S.Ct. 1612, 200 L.Ed.2d 889 (2018) (quoting 9 U.S.C. § 2). As the Supreme Court has made clear, the FAA establishes "a liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) (citation omitted). To effectuate this policy, the FAA "requires courts rigorously to enforce arbitration agreements according to their terms." *Epic Sys. Corp.*, 584 U.S. at 506 (citation and internal quotation marks omitted).

"The FAA applies to contracts 'evidencing a transaction involving commerce,' and employment contracts fall within that category." *Lopez v. Cintas Corp.*, 47 F.4th 428, 431 (5th Cir. 2022) (quoting *Circuit City*, 532 U.S. at 113). Accordingly, absent an exemption, an arbitration agreement in an employment contract will be enforced as written. *Id*. George's contract with Amazon includes an arbitration agreement, "so he has to identify an exemption to avoid arbitration." *Id*. George invokes the residual clause in Section 1 of the FAA, which exempts from its scope "contracts of employment

of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.

To decide whether a worker falls within Section 1's residual category, the Supreme Court has instructed that courts undertake a two-step inquiry. First, the Court must identify the relevant "class of workers" to which George belongs. *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 455, 142 S.Ct. 1783, 213 L.Ed.2d 27 (2022). Second, it must determine "whether that class of workers is engaged in foreign or interstate commerce." *Id.* (internal quotation marks omitted). In undertaking this inquiry, the Court is mindful that the Section 1 exclusion provision is "afforded a narrow construction." *Circuit City*, 532 U.S. at 118. As the Supreme Court has admonished, "the location of the phrase 'any other class of workers engaged in . . . commerce' in a residual provision, after specific categories of workers have been enumerated, undermines any attempt to give the provision a sweeping, open-ended construction." *Id.* Thus, the specific categories of workers enumerated in the exclusion, seamen and railroad workers, underscore the limited scope of the residual provision.[1] The residual provision is restricted to a "transportation worker who performs work analogous to that of seamen and railroad employees, whose occupations are centered on the transport of goods in interstate or foreign commerce." *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 802 (7th Cir. 2020) (Barrett, J.).

---

[1] The Supreme Court has applied the *ejusdem generis* canon to the exclusion, "which instructs courts to interpret a 'general or collective term,' at the end of a list of specific items in light of any 'common attribute[s]' shared by the specific items." *Saxon*, 596 U.S. at 458 (quoting *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 225, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008)).

6

B.

As a warehouse associate at Amazon's DDF1 facility, George was part of a class of workers who performed several functions, including physically unloading goods and packages from incoming trucks or trailers, processing those goods and packages in the facility, and placing them in an outbound vehicle for delivery to the end customer. These workers were not involved in making any outbound deliveries. Were George and his fellow warehouse associates at the DDF1 facility "engaged in foreign or interstate commerce" under Section 1? The answer is no.

As the Supreme Court explained in *Saxon*, "to be 'engaged' in something means to be 'occupied,' 'employed,' or 'involved' in it." 596 U.S. at 457. And "'[c]ommerce' . . . includes, among other things, 'the transportation of . . . goods, both by land and by sea.'" *Id.* (quoting *Black's Law Dictionary* 220 (2d ed. 1910)). "Thus, any class of workers directly involved in transporting goods across state or international borders falls within § 1's exemption." *Id.* The Court made clear that to be "directly involved" in such transportation, a worker must "at least play a direct and 'necessary role in the free flow of goods' across borders." *Id.* at 458 (quoting *Circuit City*, 532 U.S. at 121). "Put another way, transportation workers must be actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." *Id.* In *Saxon*, the Court held that the answer to this inquiry was straightforward: the class of workers at issue, airplane cargo loaders, qualified as transportation workers because their job was to physically load and unload cargo traveling "on and off planes traveling in interstate commerce." *Id.* at 457: *see also id.*

7

at 458 ("[T]here could be no doubt that [interstate] transportation [is] still in progress, and that a worker is engaged in that transportation, when she is doing the work of unloading or loading cargo from a vehicle carrying goods in interstate transit." (internal quotation marks and citation omitted)).

But what about a class of workers who are "a step removed" from direct involvement in transporting goods across borders? As the *Saxon* court acknowledged, "the answer will not always be so plain when the class of workers carries out duties further removed from the channels of interstate commerce or the actual crossing of borders." *Id*. at 457 n.2. When then-Judge Barrett considered such a class of workers in *Wallace*, a case involving Grubhub food delivery drivers, she instructed that courts should "consider whether the interstate movement of goods is a central part of the class members' job description." 970 F.3d at 801. In that case, the Grubhub drivers argued that, because they "carry goods that have moved across state and even national lines," delivering such goods "[brought] their contracts within § 1 of the FAA." *Id*. at 802; *see also id*. ("A package of potato chips, for instance, may travel across several states before landing in a meal prepared by a local restaurant and delivered by a Grubhub driver; likewise, a piece of dessert chocolate may have traveled all the way from Switzerland."). Rejecting this argument, the *Wallace* court explained that "to fall within the exemption, [] workers must be connected not simply to the goods, but to the act of moving those goods across state or national borders." *Id*. In other words, for the exemption to apply, "a class of workers must themselves

8

be engaged *in the channels* of foreign or interstate commerce." *Id.* (internal quotation marks and citation omitted).

The Fifth Circuit's decision in *Lopez* is also instructive. In that case, the court considered whether a group of local delivery drivers, a class of workers "a step removed" from the airline cargo loaders at issue in *Saxon*, were "engaged in foreign or interstate commerce" under Section 1. 47 F.4th at 432. The delivery drivers "picked up items from a Houston warehouse (items shipped from out of state) and delivered them to local customers." *Id.* at 430. The court concluded that the drivers were not exempt under Section 1, explaining that, "[o]nce the goods arrived at the Houston warehouse and were unloaded, anyone interacting with those goods was no longer engaged in interstate commerce." *Id.* at 433.

A similar analysis applies to George and the warehouse associates at Amazon's DDF1 facility in Lewisville. Although DDF1 is a delivery station, the record shows that nearly every inbound shipment received and processed there (nearly 99% of such shipments) originates within Texas. And all the outbound shipments from DDF1 are delivered to end customers within the State, indeed within a thirty-mile radius of the facility. As courts have recognized, a class of workers who only incidentally or occasionally perform work involving items traveling in interstate commerce, like George and the other warehouse associates at Amazon's DDF1 facility, does not qualify for Section 1's exemption. *E.g.*, *Wallace*, 970 F.3d at 800 (explaining that "someone whose occupation is not defined by its engagement in interstate commerce does not qualify for the exemption just because she occasionally performs that kind

9

of work"); *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1289–90 (11th Cir. 2005) (holding that furniture salespeople are not "transportation workers" even if they occasionally deliver furniture to out-of-state customers).

\* \* \* \*

Because George was not part of a class of workers "engaged in foreign or interstate commerce" while employed as a warehouse associate for Amazon, he is not exempt from arbitration under Section 1 of the FAA. George's arbitration agreement with Amazon will be enforced according to its terms.

## IV.

It is therefore **ORDERED** that Amazon's First Amended Motion to Compel Arbitration and Abate Proceedings, (Dkt. #18), is **GRANTED**.

It is further **ORDERED** that Amazon's original Motion to Compel Arbitration and Abate Proceedings, (Dkt. #6), is **DENIED as moot**.

It is further **ORDERED** that Amazon's Motion for Leave to Late Serve Expert Reports, (Dkt. #17), is **DENIED as moot**.

The Court **ORDERS** the parties to submit their dispute to arbitration as provided by their Mutual Agreement to Arbitrate and the terms therein. It is further **ORDERED** that all deadlines and proceedings in this case are **STAYED** pending resolution of the arbitration. The parties shall provide joint status updates every four months, with the first report due on **March 10, 2026**.

**So ORDERED and SIGNED this 10th day of November, 2025.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE